Dear Mr. Gremillion:
You have requested an opinion of the Attorney General relative to the powers and duties of the Rapides Parish Communications District (the "District"), a political subdivision of the State, established to enhance the capability of Rapides Parish (the "Parish") to respond to requests for emergency assistance. You specifically ask whether District Funds generated by a voter-approved emergency telephone service charge may be used to provide non-emergency dispatch services to various public entities located within the District's geographical boundaries.
Representatives of the District have furnished us with the following factual scenarios as representative of the issue at hand:
 1. The District has been answering non-emergency telephone calls for several municipalities. For example, calls received by a municipality are automatically routed to the non-emergency telephone line maintained by the District as its general business line.
 2. The District has also been call-taking and dispatching non-emergency radio transmission between police officers and their central offices, thereby obviating the need for police departments to have their own radio dispatchers.
The District has neither the personnel nor the resources to furnish the above services. Further, the District is concerned that the expenditure of its dedicated fees for non-emergency purposes is legally impermissible.
It is our opinion that the expenditures and practices, in question, must be examined in light of Article VII, Section 14 of the Louisiana Constitution of 1974. It provides, in pertinent, the following:
 "§ 14. (A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private . . . .
 * * *
 (C) Cooperative Endeavors. For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation, or individual."
A very comprehensive analysis of the above Section, as it relates to the expenditure of public funds, was undertaken by this office in Attorney General Opinion No. 90-651. As noted therein, the constitutional norm for the use of public funds, property and personnel is found in Section 14. As quoted above, Paragraph (A) generally prohibits the loan, pledge or donation of public funds, property and personnel. Exceptions to this prohibition are found in Paragraph (B), none of which appear to be relevant to the issue at hand.
Paragraph (C) of Section 14 authorizes the state and its political subdivisions (i.e., the District) to engage in cooperative endeavors for a public purpose with other governmental agencies, public or private associations and corporations and/or individuals. However, Paragraph (C) merely supplements the prohibition against donations contained in Paragraph (A). It does not create an exemption or exception from the general constitutional norm. In other words, the cooperative endeavor must meet the general standards for the non-gratuitous alienation of public funds established in Paragraph (A).City of Port Allen v. Louisiana Risk Management, etal., 439 So.2d 399 (La. 1983) and Attorney General Opinion No. 90-651.
In City of Port Allen, the Supreme Court ruled:
 "The cases that do exist [under La. Const. Art. IV § 12 (1921)] hold primarily that this section is violated whenever the state or a political subdivision seeks to give up something of value when it is under no legal obligation to do so . . . .
 * * *
 Section 14(C) does not help the state, either. There is no indication that it is meant to be an exception to the rule of § 14(A); the exceptions are clearly contained in § 14(B). Thus, even if political subdivisions cooperate for a public purpose, they still may not give away their assets to other political subdivisions, the United States Government, or public or private associations or corporations, or to individuals merely for a `public purpose'." (Emphasis added.)
The threshold requirement of the constitutional doctrine for distinguishing between invalid and lawful expenditures and transfers of public funds and property is the presence of a legal obligation or duty by the transferor to alienate said funds or property. See also Beard-Poulan, Inc. v. Dept. ofHighways, 362 F. Supp. 547 (W.D. La. 1973) and Townof Brusly v. West Baton Rouge Parish Police Jury,283 So.2d 288 (La.App. 1st Cir. 1973).
This prerequisite is satisfied by the presence of avalid statute, ordinance, charter or contract. The vehicle by which the obligation is created may, nevertheless, be ultra vires or unconstitutional if it creates no binding legal obligation or if the obligation created is substantially inconsistent with, or beyond the scope of the District's authorized duties. Attorney General Opinion No. 90-651.
As noted above, the requirement of a legal duty is the threshold, but not the only predicate for the constitutionality of the expenditure. Second, the expenditure must also be for a public purpose. Third, the expenditure must create a public benefit proportionate to the cost (i.e., the amount expended). Attorney General Opinion Nos. 93-787, 92-722, 92-127 and 90-651.
The legal obligation/duty standard was applied by the Second Circuit Court of Appeal in James v. Rapides Police Jury,113 So.2d 88 (La.App. 2nd Cir. 1959). James discusses two fundamental principles of importance related to this constitutional doctrine. The first is that the worthiness of the recipient and of the actual use of public funds or property is immaterial to the issue of the constitutionality of the transfer by the public entity. As the Court notes:
 "Though it may be regarded as an unnecessary comment, we think it is appropriate in the instant case to observe that these specific prohibitions have been wisely implanted in our fundamental law, for it is conceivable that without such prohibitions the State, or a political subdivision thereof, might so deplete the public fisc by contributions to almost innumerable worthy private and semi-public enterprises as to seriously impair the necessary expense of conducting more prosaic but more important governmental functions."
In other words, to allow unrestricted expenditures of public funds by any and all political subdivisions, public agencies, entities or officers, as long as those entities or persons can imagine some species of "public good" or "public benefit" resulting therefrom, would be to authorize a fragmentation and incoherence in fiscal policy at all levels of state government. This, Article VII, § 14 seeks to prevent by requiring avalid legal authority (even at the contractual level) for the alienation of public funds. The effect of Article VII, § 14, as interpreted by the Supreme Court and the Attorney General, is to give further constitutional protection and definition to the plenary power of the legislature over the public fisc, and to insure that political subdivisions conform to statewide general fiscal policy rather than formulate it on the basis of local expediency within their own territorial jurisdictions.
The second important statement of James is that custom, as expressed in the doctrine of contemporaneous construction, can not modify or negate the operation of the prohibition of Article VII, Section 14. Regardless of how long or how often any governmental entity has expended or used public funds, property or personnel for the benefit of others, public or private, the duration and repetition of that practice does not create an exemption to the prohibition of Article VII, Section 14 by eithercontra legem custom or by the contemporaneous construction doctrine. Past illegality does not justify future illegality. La. Civ. Code Art. 3.
As can be seen from the above, the unequivocal prohibition established by Article VII, Section 14 constitutes one of the most enduring and formally consistent constitutional provisions in Louisiana law. Further, it has been consistently recognized and upheld by this office. Attorney General Opinion Nos. 94-515, 93-787, 93-766, 93-665, 93-558, 92-494, 91-104, 90-652, 89-180 and 84-871. With this in mind, we turn to your inquiry.
The District was created pursuant to R.S. 33:9101. The purposes for the District are clearly enumerated by the Legislature in Section 9102(A) as follows:
"§ 9102. Purposes
 It has been shown to be in the public interest to shorten the time required for a citizen to request and receive emergency aid. The provision of a single, primary three-digit emergency number through which emergency services
can be quickly and efficiently obtained will provide a significant contribution to law enforcement and other public service efforts by simplifying the notification of public service personnel. Furthermore, the identification of all streets, roads, highways, and dwelling places by name and number will serve to decrease the response time of law enforcement and public service personnel to emergency calls by facilitating the systematic location of such places without difficulty and ambiguity. Such a simplified means of procuring emergency services will result in the saving of life, a reduction in the destruction of property, quicker apprehension of criminals, and ultimately the saving of monies. Establishment of a uniform emergency number and identification of thoroughfares and dwelling places are matters of concern and interest to all citizens. It is the purpose of this Chapter to establish the number 911 as the primary emergency telephone number
for use in communications districts created in parishes as herein provided and to provide for the identification of all streets, roads, highways and dwelling places in such districts which are not otherwise designated by name and number." (Emphasis added.)
In accordance with Section 9101, the Rapides Parish Police Jury, by Ordinance passed on February 18, 1986, created the District and facilitated the appointment of its Board of Commissioners ("Board"). On September 3, 1986, the Board met and requested the Police Jury to place on its November 4th ballot, a proposition authorizing the levy and collection of an emergency telephone service charge in accordance with Section 9106(B)(1). The minutes of this meeting reflect that the resolution further provides the following:
 ". . . if the voters of Rapides Parish elect to implement a tariff . . . all monies after received by the Board will be dispensed in accordance with Louisiana Revised Statutes 33:9101-33:9106. . . ." (Emphasis added.)
The Police Jury subsequently levied an emergency telephone charge approved by the electorate resulting from the passage of a Proposition which provides, in pertinent part:
 "Shall the Rapides Parish Communications District, State of Louisiana, levy and collect a special emergency telephone surcharge not to exceed 5% of the tariff rate for local telephone service supplied within the district for the purpose of establishing, maintaining and operating the 911 emergency telephone system; . . . and that the Board be governed by Chapter 31, Title 33 of Louisiana Revised Statutes of 1950, as amended, (R.S. 33:9101-9106) and other constitutional or statutory authority as provided by the legislature?" (Emphasis added.)
A review of the above resolution, proposition and statutory provisions unequivocally disclose one common thread, to wit: That the sole purpose for which the District is created, and the funds generated by the service charge may be used, is to establish, maintain and operate a 911 emergency telephone service and the expenses associated with the identification of thoroughfares and dwellings. We see no indication, whatsoever, that the Legislature and the voters of Rapides Parish intended for the District to be burdened with non-emergency telephone calls, other than those pertaining to the business operation of the District received on its non-emergency business line.
Further, the law does not authorize the District to assume the roll of a clearing house for call-taking and dispatching non-emergency radio transmissions between law enforcement officials and their central office.
While the above may constitute public purposes, resulting in the conservation of finances and personnel for the other entities involved, there is absolutely no legal authority (i.e., obligation) on the part of the District to provide these non-emergency services. There being no underlying legal obligation or authority for the expenditure of public funds by the District for non-emergency services, we are constrained to hold that the use of the District's funds and personnel for this purpose is prohibited by Article VII, Section 14.
As previously noted, the worthiness of the recipient and the public use of the funds, in question, is immaterial to the issue of constitutionality. Also, the fact that these services may have been gratuitously rendered by the District in the past, does not justify future illegality.
Trusting this adequately responds to inquiry, I am
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
By: ______________________________________
 ROBERT E. HARROUN, III
Assistant Attorney General
RPI/Rob III,/cla
Date Received:
Date Released: